Filed 12/3/25  P. v. Heard CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN ANTHONY HEARD et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B334248<br>(Super. Ct. No. KA126155)<br>(Los Angeles County) |

Stephen Anthony Heard, Johnny Sierra Velasquez, and Jesus Delgado appeal from the judgment after a jury convicted them of the first degree murder of Joshua Rodriguez (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a); count 1), and conspiracy to commit murder (§ 182, subd. (a)(1); count 2).  The jury found true the special circumstance that all appellants intentionally killed the victim by means of lying in wait (§ 190.2, subd. (a)(15)).  The

---

[1] All undesignated statutory references are to the Penal Code.

jury also found true the allegation that all appellants personally used a firearm for both counts (§ 12022.53, subd. (b)), and that Heard personally used a deadly weapon (a zip tie cord) (§ 12022, subd. (b)(1)).[2]

The trial court found true the allegations that Heard and Velasquez each had a prior serious felony conviction (§ 667, subd. (a)(1)) that also constituted a prior "strike" pursuant to the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12, subds. (b), (c)(1)). For count 1, the court sentenced appellants to state prison for life without the possibility of parole, plus an additional 11 years for Heard and an additional 10 years for Velasquez and Delgado. The court stayed the sentences for count 2.

Delgado contends the trial court improperly instructed the jury regarding lying in wait, both as the basis for first degree murder and as a special circumstance. Heard and Velasquez contend the evidence was insufficient to prove the special circumstance of lying in wait. Velasquez also contends the trial court erred in admitting a jail phone call, and in concluding his prior conviction for carrying a firearm with a gang enhancement (former §§ 12031, subd. (a)(1), 186.22, subd. (b)(1)) was a serious felony prior and a strike.

We reverse the finding regarding Velasquez's prior serious

---

[2] For all appellants, the jury found *not true* the special circumstances that the murder was committed in the course of a kidnapping (§ 190.2, subd. (a)(17)(B)) and involved the infliction of torture (*id*., subd. (a)(18)). The jury also found *not true* the allegation in both counts that Delgado's use of a firearm caused great bodily injury or death (§ 12022.53, subd. (d)). The court granted the People's motion to dismiss gang allegations as to all appellants. (§ 186.22, subd. (b)(1)(C)).

felony and strike and remand his case for further proceedings regarding his prior serious felony, strike, and sentence.  In all other respects, we affirm.

FACTUAL AND PROCEDURAL HISTORY

N.A. is Heard's daughter.  She dated the victim, Rodriguez, for about six months.  He never hit or sexually assaulted her.  They broke up about a month before he was murdered.

A "couple of weeks" before the murder, N.A. was sleeping in her SUV when she was raped.  The assailant was not Rodriguez but someone else she recognized.  N.A. went to the hospital following the rape.  She then moved into her parents' house.

Heard received a phone call from someone saying Rodriguez beat up N.A. and she was in the hospital.  Heard said he was going to kill Rodriguez.

Velasquez was a "shot-caller" of a gang.  Six days before the murder, Velasquez texted that he was about to look for Rodriguez for "dissing the hood."  Velasquez told Emmanuel Santana, the leader and "shot-caller" of another gang, that they were looking for Rodriguez.  Velasquez said Rodriguez had a "green light" because he had done something to Heard's daughter.  A green light means the Mexican Mafia has marked a person for death.  Velasquez said Santana's gang needed to find Rodriguez or they would also be green-lighted.  Velasquez said if any of Santana's gang got caught with Rodriguez, they would get "the same treatment."

A week or two before the murder, Velasquez said that Rodriguez might be at the home of a woman Rodriguez was dating and suggested they look for him there.  Velasquez, Heard, and an employee of the body shop Heard owned then went to her trailer.  Heard and Velasquez were each armed with a knife and

the employee carried a stick.  They left when they learned Rodriguez was not there.

Shortly before the murder, Santana learned that Rodriguez was asleep at a Towne Avenue apartment.  Santana had two members of his gang, Alfredo Avila and Adam Garcia, go to the apartment and confirm the information, but not wake Rodriguez.  Avila and Garcia then went to the apartment and confirmed he was still asleep.  Avila told one of the people at the apartment to stay away from Rodriguez.

Santana then called Velasquez and told him Rodriguez was asleep at the Towne apartment.  Avila asked Velasquez if he wanted them to wake Rodriguez and tie him up.  Velasquez responded to "leave him in peace" and "just let him sleep." Velasquez told Avila they were "going to come get" Rodriguez.

Heard confronted N.A. at their house.  He was "enraged" and demanded to know what Rodriguez "did to [her]."  She repeatedly denied that he had physically assaulted or otherwise harmed her, but Heard wouldn't listen.  He said, "I'm going to kill that motherfucker."  Heard told N.A. he sent a letter or memo to "the big homies" and got permission to murder Rodriguez.  Heard said he had three days to kill Rodriguez, and if he didn't, he would be killed himself.

Heard then received a phone call from Velasquez.  Heard said, " 'Make sure he doesn't leave.' "  Heard said he was "on his way" and would " 'be there soon.' "  Heard left the house at about 1:00 a.m.

Heard had Delgado and Benjamin Quiroz meet him at his body shop.  Heard told them his daughter had been " 'raped or something and got beat up' " and they needed to go to the apartment where Rodriguez was.  Heard told Quiroz he had been

looking for Rodriguez "for some time before they found him."

Heard, Velasquez, Delgado, Quiroz, and someone identified only as "Joey" then drove to the Towne apartment building in two vehicles. Heard and Velasquez were in the same vehicle. One of the group went up to the apartment and confirmed Rodriguez was there while the others waited in the alley.

Heard, Velasquez, Delgado, and Quiroz then entered the apartment. Heard and Velasquez had handguns. Delgado had a shotgun. Heard pulled a zip tie from his back pocket and held it in his hand as they entered the apartment.

Rodriguez was asleep on a couch in the kitchen area. Several other people were in the apartment. Quiroz made sure they stayed on the couch and didn't interfere. The people present were told to put their heads down.

Heard pointed a gun at Rodriguez's face and said, " 'I'm going to kill this dude.' " Rodriguez tried to run out. Heard hit Rodriguez in the face and head with his fist "as hard and as much as he could." Velasquez and Quiroz also hit Rodriguez. Delgado hit Rodriguez in the face with the shotgun.

Rodriguez was spitting out blood. Heard put a zip tie around Rodriguez's neck and tightened it. As Delgado and others carried him out of the apartment, he choked and made a gargling sound.

Rodriguez's body was found 11 days later. The cause of death was asphyxiation by ligature strangulation. There were also two lacerations on his head caused by a blunt instrument such as a shotgun.

In a *Perkins* operation,[3] Delgado told undercover operatives

---

[3] *Illinois v. Perkins* (1990) 496 U.S. 292.

it was a "sanctioned hit" that was "greenlit" by "the big homies." He said, "[T]he homie said it was greenlit, so I go." An operative asked Delgado, "[H]ow did you guy [*sic*] catch him slipping?" Delgado answered, "He was sleep [*sic*]."

At sentencing, the court exercised its discretion to dismiss Heard's and Velasquez's five-year enhancements for a prior serious felony (§§ 667, subd. (a)(1), 1385, subds. (a), (b)(1)). The court sentenced each appellant to life without parole for first degree murder (§§ 187, subd. (a), 189, subd. (a)) with the special circumstance of lying in wait (§ 190.2, subd. (a)(15)). The court enhanced each appellant's sentence by 10 years for firearm use (§ 12022.53, subd. (b)), plus an additional year for Heard for use of the zip tie as a deadly weapon (§ 12022, subd. (b)(1)). For conspiracy with its enhancements (count 2), the court sentenced Heard to 61 years to life, Velasquez to 60 years to life, and Delgado to 35 years to life, but stayed the sentences pursuant to section 654.

## DISCUSSION

### *Instructions, lying in wait first degree murder*

The trial court instructed the jury that murder is of the first degree if it is willful, deliberate, and premeditated, or perpetrated by lying in wait, torture, or kidnapping. (CALCRIM Nos. 521, modified; 540A, modified; 540B, modified; see § 189, subd. (a).) The prosecution argued all four theories to the jury. The jury found true the special circumstance of lying in wait, and not true the special circumstances of torture and kidnapping.

Delgado contends the jury instruction regarding first degree murder based on lying in wait was erroneous. We independently review this contention (*People v. Posey* (2004) 32 Cal.4th 193, 218) and conclude the instruction was correct.

6

The instruction stated in relevant part:

"The defendant murdered by lying in wait if:

"1. He concealed his purpose from the person killed;

"2. He waited and watched for an opportunity to act;

"AND

"3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying-in-wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.  *Deliberation* means carefully weighing the considerations for and against a choice and, knowing the consequences, deciding to act.  An act is done with *premeditation* if the decision to commit the act is made before the act is done.

"A person can conceal his or her purpose even if the person killed is aware of the person's physical presence.

"The concealment can be accomplished by ambush or some other secret plan."  (CALCRIM No. 521, modified.)

The instruction correctly stated the requirements for first degree murder by lying in wait: "concealment of purpose together with 'a substantial period of watching and waiting for an opportune time to act, and . . . immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 795.)  " 'Premeditated' simply means ' "considered beforehand." ' " (*Ibid.*)

Delgado contends the reference to "premeditation" in the instruction was inadequate because it applied to the act of lying in wait and not the act of killing and the intent to kill.  We disagree because it correctly stated the requirement that the duration of the lying in wait " 'is such as to show a state of mind

7

*equivalent to* premeditation *or* deliberation.' " (*People v. Stanley, supra*, 10 Cal.4th at p. 794, first italics added.) "[W]e consider the defendant to have acted with '*the functional equivalent* of' a premeditated, deliberate intent to kill [citation], such that 'no further evidence of premeditation and deliberation is required in order to convict the defendant of first degree murder.' " (*People v. Brown* (2023) 14 Cal.5th 453, 465 (*Brown*), italics added.) Because the instruction was correct, Delgado forfeited his request for further explanation by not requesting it in the trial court. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1223; *People v. Turner* (2019) 37 Cal.App.5th 882, 887–888.)

   *Brown, supra*, 14 Cal.5th 453, upon which Delgado relies, does not require additional or different instructions.  Our Supreme Court there concluded that giving an infant breastmilk while the mother had heroin in her system did not constitute first degree murder by poison because, like lying in wait, first degree murder by poison requires "a mental state equivalent in turpitude to willfulness, deliberation, and premeditation." (*Id.* at pp. 465–466.)  In *Brown*, our high court concluded that "the prosecution must show the defendant deliberately gave the victim poison with the intent to kill the victim or inflict injury likely to cause death." (*Id.* at p. 457.)  The court did not impose new requirements for lying in wait, but relied on existing precedent regarding first degree murder by lying in wait. (*Id.* at pp. 464–466.)

   Delgado contends the jury should have been instructed that the defendant acted with " ' "a wanton and reckless intent to inflict injury likely to cause death." ' " (*Brown, supra*, 14 Cal.5th at p. 465.)  But *Brown* requires that the prosecution prove the defendant acted with the intent to "inflict injury likely to cause

8

death" *or* "the intent to kill the victim." (*Id*. at p. 457.) If failure to include that language in the instruction here was error, it was harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 because "the jury necessarily found an intent to kill under other properly given instructions." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 929.) The jury found the higher level of culpability— the intent to kill—by finding true the special circumstance of lying in wait, and by finding Delgado guilty of conspiracy to commit first degree murder, both of which the court properly instructed required the intent to kill. (CALCRIM Nos. 728, modified; 563, modified.) " 'If, as we find, the evidence supports the special circumstance, it necessarily supports the [lying-in-wait] theory of first degree murder.' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1149.)

*Instructions, lying in wait special circumstance*

Delgado also contends the jury instruction for the lying-in-wait special circumstance was defective because it did not require intent to kill. We disagree.

A sentence of life without parole based on a special circumstance such as lying in wait applies to a "person, not the actual killer" who aids and abets the murder "with the intent to kill." (§ 190.2, subd. (c).) "[T]he lying-in-wait special circumstance requires a finding of intent to kill," which is a " ' "more stringent" ' " requirement than first degree murder by lying in wait, which "requires only a 'wanton and reckless intent to inflict injury likely to cause death.' " (*People v. Johnson* (2016) 62 Cal.4th 600, 633.)

The jury was properly instructed regarding the lying-in-wait special circumstance, including the requirement of intent to kill. The instruction stated the People must prove that "[t]he

9

defendant *intentionally killed* Joshua Rodriguez," and "[h]e *intended to kill* the person by taking the person by surprise." It further required "a state of mind equivalent to deliberation and premeditation," including that "knowing the consequences, [he] *decided to kill*," and "he *decided to kill* before committing the act that caused death." (CALCRIM No. 728, modified, italics added.)

This jury instruction was not limited to Heard as the actual killer. The jury was instructed that it "must consider each special circumstance separately for each defendant." (CALCRIM No. 700.) The jury was also instructed regarding aiding and abetting, including the requirement that Delgado "knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CALCRIM No. 401.) Moreover, if these instructions were defective, the error was harmless beyond a reasonable doubt because the jury found Delgado had the intent to kill by finding him guilty of conspiracy to commit first degree murder, which the court properly instructed required the intent to kill. (CALCRIM No. 563, modified; *People v. Covarrubias*, *supra*, 1 Cal.5th at p. 929.)

*Sufficiency of evidence, lying in wait special circumstance*

Heard and Velasquez contend the evidence was insufficient to prove the special circumstance of lying in wait. We again disagree.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value . . . . In

10

applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Ibid.*)

" ' "The lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.' " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.) " ' " 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' " ' " (*Ibid.*)

The evidence here shows the intent to kill. Heard and Velasquez sought Rodriguez's location so they could implement the "green light" to kill him. When they learned Rodriguez was asleep in an apartment, they decided the time was right. Velasquez said to "let him sleep." Heard said, " 'Make sure he doesn't leave.' " Based on the evidence, including the phone calls, the close relationship between Velasquez and Heard, and their travel in the same vehicle to the apartment, the jury could reasonably conclude that they planned together to attack Rodriguez while he was sleeping.

Appellants waited in the alley while one of their group confirmed Rodriguez was present. They made sure others in the

11

apartment would not interfere. They concealed their purpose from Rodriguez and attacked him by surprise from a position of advantage by attacking him while he slept. "Waiting and watching until a victim falls asleep before attacking is a typical scenario of a murder by means of lying in wait." (*People v. Michaels* (2002) 28 Cal.4th 486, 516.) We see no material difference between waiting until a victim *falls* asleep and ensuring the victim *remains* asleep. Appellants killed Rodriguez by lying in wait because they took him "unawares" and "ambush[ed]" him. (*People v. Tuthill* (1947) 31 Cal.2d 92, 100–101.)

　　*People v. Hardy* (1992) 2 Cal.4th 86 is instructive. The defendants there drove to the victims' home in the early morning hours, raising a reasonable inference "that they chose this time of night because it could be expected the victims would be asleep." (*Id.* at pp. 163–164.) They "silently gain[ed] access," disabled the porch light, and murdered the victims. (*Id.* at p. 164.) "From this evidence, the jury could reasonably conclude defendants concealed their murderous intention and struck from a position of surprise and advantage, factors which are the hallmark of a murder by lying in wait. Insisting on a showing that defendants actually watched the victims sleeping and waited a moment before attacking reads the law in too literal a fashion." (*Ibid.*) Here too, appellants took steps to ensure Rodriguez would remain asleep so they could attack from a position of surprise and advantage.

　　Heard contends he did not conceal his purpose to murder Rodriguez because he told several people he intended to do so. But the Mexican Mafia's threats to anyone who associated with Rodriguez or failed to assist in locating him ensured that others

12

would not alert him.  Appellants' purpose was concealed from Rodriguez even though others knew about it.

*Jail phone call*

Velasquez contends the trial court erred in admitting a telephone call from Velasquez in jail to Heard.  We are not persuaded.

The recording was two minutes long.  The gist of the call was that a "fool" in jail did not know who Heard was.  Heard said, "You tell him I'm Big Huero from Malditos."[4]  He disparaged the "fool" and said to identify himself as a nephew of another person he named.  In the call, Velasquez addressed Heard as "pops" and said, "I told 'em, your homeboy Huero that's my pops."

Velasquez contends that other than the statement "I'm Big Huero from Malditos," the recording was irrelevant.  The trial court overruled the relevance objection.  The court stated, "[I]t appears that Mr. Heard is impressing upon Mr. Velasquez, 'You tell them who they're dealing with, you tell them who I am.' " The court stated the rest of the conversation was not lengthy, was not unduly prejudicial, and was necessary to put the conversation in context.

We review the admission of evidence and the weighing of probative value against prejudice for abuse of discretion.  (Evid. Code, § 352; *People v. McKinnon* (2011) 52 Cal.4th 610, 655.) "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and *which has very little effect on the issues*." (*People v. Barrett* (2025) 17 Cal.5th 897, 955.)  Compared to the evidence of the violent strangulation

---

[4] According to the prosecutor, Malditos is a clique within Florencia 13, a gang of which Heard was a member.

murder, in our view the call would not "evoke an emotional bias against the defendant."  No error has been shown because Velasquez "fails to show the trial court exercised its discretion ' " ' "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' "  (*Ibid.*)

Because the jury could draw permissible inferences from the evidence, its admission did not violate due process.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 697.)  The prosecutor argued that Velasquez and Heard were "thick as thieves" and that "Johnny Velasquez had absolute knowledge as to what Stephen Heard's plan was."  Velasquez's references to Heard as his "pops" show they were close and supported the inference that they shared knowledge of the plan to murder Rodriguez.

In the call, Velasquez said, "They give me a hard time, I will shut them down."  This supported the prosecutor's argument that Velasquez was "a shot-caller."  The comment did not suggest how he would do so and does not demonstrate a bad or violent character.

During the call, Velasquez asked, "Remember, remember that issue that was going on out there?"  Heard did not answer the question, and the "issue" remained undefined.  Velasquez has not shown a likelihood that the jury speculated the "issue" had some prejudicial meaning.  Nor were gang references in the call prejudicial because Heard's and Velasquez's gang affiliations were not disputed.  The remainder of the call was innocuous and did not mislead the jury or deny Velasquez a fair trial.

### *Velasquez's prior serious felony and strike*

Velasquez was sentenced on count 2 (conspiracy) to 60 years to life (25 years to life, doubled for the strike, plus 10 years for use of a firearm).  The trial court stayed the sentence for

14

count 2 pursuant to section 654.  Velasquez contends the trial court erred in concluding his prior conviction for carrying a loaded firearm (former § 12031, subd. (a)(1)),[5] with a gang enhancement (former § 186.22, subd. (b)(1))[6] was a serious felony for purposes of a five-year sentencing enhancement (§ 667, subd. (a)(1)) and constituting a strike (§§ 667, subds. (b)–(j), 1170.12). The Attorney General concedes the "prior strike finding appears to be invalid."  On this record, we agree.

Velasquez waived a jury trial on the prior serious felony strike allegations.  The trial court relied on the abstract of judgment, which showed that in 2002 Velasquez pleaded guilty or no contest to the firearm charge and admitted the gang allegation.  The prior conviction constituted a serious felony and a strike based on the allegation it was committed for the benefit of a criminal street gang.  (§§ 667, subd. (d)(1), 1170.12, subd.

---

[5] Former section 12031, subdivision (a)(1) prohibited carrying a loaded firearm on the person or in a vehicle in a public place or on a public street.  (Stats. 1999, ch. 571, § 3, p. 3963.) Violation was generally a misdemeanor.  (Former § 12031, subd. (a)(2)(G).)  It was elevated to a felony "[w]here the person is an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22."  (*Id*., subd. (a)(2)(C).)  Section 12031 was repealed effective January 1, 2012, and renumbered without substantive change as section 25850.  (Stats. 2010, ch. 711, §§ 4, 6.)

[6] Former section 186.22, subdivision (b)(1) applied to "a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (Stats. 1997, ch. 500, § 2; Prop. 21, § 4, approved March 7, 2000, eff. March 8, 2000.)

15

(b)(1), 1192.7, subd. (c)(28); *People v. Briceno* (2004) 34 Cal.4th 451, 456.)

"On an appellate challenge to a finding that a prior conviction was a strike, where the prior conviction is for an offense that can be committed in multiple ways, one or more of which would not qualify it as a strike, and *if it cannot be determined from the record that the offense was committed in a way that would make it a strike,* a reviewing court must presume the offense was not a strike." (*People v. Watts* (2005) 131 Cal.App.4th 589, 596.)  In *Watts*, the appellate court remanded to the trial court to give the People the opportunity to retry the strike allegation.  (*Id*. at p. 597.)

Here, Velasquez pleaded guilty to the prior offense after *People v. Robles* (2000) 23 Cal.4th 1106, 1115, which held that former section 12031, subdivision (a)(2)(C) applied only if all three elements of section 186.22, subdivision (a) were proven. But the conviction predated *People v. Lamas* (2007) 42 Cal.4th 516, 520, which requires the prosecution to "prove that the charged gang member willfully promoted, furthered, or assisted members of his gang in *felonious* criminal conduct that is *distinct from* his otherwise misdemeanor conduct of carrying a loaded firearm in public or carrying a concealed weapon on his person."

The plea also predated the 2021 amendment to section 186.22 by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, § 1).  That amendment narrowed the definitions of " 'criminal street gang,' " " 'pattern of criminal activity,' " and "what it means for an offense to have commonly benefitted a street gang." (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.) After briefing was completed in this appeal, our Supreme Court resolved a conflict of authority regarding whether prior

16

convictions with gang allegations are affected by the 2021 amendments to section 186.22. (*People v. Fletcher* (2025) 18 Cal.5th 576 (*Fletcher*).) The court concluded that "with regard to prior convictions . . . that are premised on violations of section 186.22, current law applies in determining whether they qualify as prior serious felony convictions under section 1192.7, subdivision (c)(28)." (*Id*. at p. 587.)

As in *Fletcher*, the abstract of judgment upon which the trial court relied here shows only that Velasquez was convicted of unlawful possession of a firearm with a gang enhancement and "provide[s] no information regarding the evidence used to obtain [this] conviction[] or [Velasquez's] underlying conduct." (*Fletcher*, *supra*, 18 Cal.5th at p. 606.) "[T]he current law applicable to this nonfinal proceeding includes Assembly Bill 333's redefinition of the elements of gang offenses and enhancements under section 186.22. There is no indication that [the prior] conviction was obtained under Assembly Bill 333's more stringent requirements, and the abstract[] of judgment . . . do[es] not alone prove the elements of the alleged prior serious felony and strike prior enhancements beyond a reasonable doubt. The appropriate remedy is reversal of the findings on these enhancements for retrial under the correct law." (*Id*. at p. 607)

In light of *Fletcher*, we remand to the superior court to afford the People the opportunity to present additional evidence regarding the prior serious felony and strike conviction. (*Fletcher*, *supra*, 18 Cal.5th at pp. 607–608; *People v. Watts*, *supra*, 131 Cal.App.4th at pp. 597–598.) If Velasquez is not timely retried regarding the prior strike (see § 1382, subd. (a)(2)) or the prior strike is not proven, the trial court shall resentence Velasquez on count 2 without the strike.

17

DISPOSITION

We reverse the finding that Velasquez's prior conviction constitutes a serious felony and a strike and remand his case for further proceedings regarding his prior conviction and sentence for count 2.  In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED.

BALTODANO, Acting P. J.

We concur:

CODY, J.

HIPPACH, J.*

_____

* Judge of the Santa Barbara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18

George G. Lomeli, Judge

Superior Court County of Los Angeles

_____

Olivia Meme, under appointment by the Court of Appeal, for Defendant and Appellant Stephen Anthony Heard.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Delgado.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant Johnny Velasquez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.